FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-10309 |
| *Plaintiff-Appellee*, | D.C. No. 3:19-cr-00313-WHA-1 |
| v. | |
| ROBERT MANNING, | |
| | OPINION |
| *Defendant-Appellant*. | |

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 22-10310 |
| *Plaintiff-Appellee*, | D.C. No. 3:19-cr-00313-WHA-2 |
| v. | |
| JAMARE COATS, | |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the Northern District of California
William Alsup, District Judge, Presiding

Argued and Submitted August 19, 2024
San Francisco, California

Filed August 20, 2025

Before:  Marsha S. Berzon, Daniel A. Bress, and Lawrence
VanDyke, Circuit Judges.

Opinion by Judge Bress;
Dissent by Judge Berzon

## SUMMARY[*]

### Criminal Law

The panel affirmed two defendants' convictions for murder in aid of racketeering, in violation of the Violent Crimes in Aid of Racketeering (VICAR) statute, 18 U.S.C. § 1959(a), and possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1).

Defendants argued that the district court erred in concluding that it lacked authority to bifurcate the trial on different elements of VICAR murder.  In defendants' view, the district court should have first held a trial on whether defendants were responsible for the murder, and then, if defendants were found guilty of that murder, proceed to a second phase on the remaining VICAR murder elements.  The panel held that, as the district court concluded, *United States v. Barker*, 1 F.3d 957 (9th Cir. 1993), *opinion amended on denial of reh'g*, 20 F.3d 365 (9th Cir. 1994),

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

precludes bifurcation of the trial on the different elements of a single VICAR murder charge.

Defendants also argued that the district court erred in rejecting a challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), to the government's peremptory strike of a juror, who was later determined to be Black. Holding that there was no *Batson* violation, the panel (1) agreed with the district court's determination at *Batson* step two that the juror's views—expressed in her juror questionnaire, that policing in the United States is "rooted in anti-black racism" and is "structurally" racist—provided a neutral justification for the government striking her; and (2) found no error in the district court's determination, at *Batson* step three, that the government's reason for striking the juror was not pretextual.

The panel addressed other issues in an accompanying memorandum disposition.

Judge Berzon dissented in part and dissented from the judgment. She wrote that in holding that *Barker* stands for the general proposition that trial on different elements of a single charge can never be bifurcated, the majority dramatically overstates *Barker*'s holding. She emphasized that the VICAR statute is fundamentally different from 18 U.S.C. § 922(g)(1) with regard to a critical aspect of *Barker*—that the element of possession of a firearm is ordinarily a benign act, not a crime. In her view, *Barker*'s reasoning does not support expanding its holding to VICAR, and there were compelling reasons here to bifurcate the trial. She agreed that the district court correctly rejected defendants' *Batson* challenge, but because the district court's erroneous conclusion that it could not bifurcate the

trial was not harmless, she would reverse and remand for a new trial.

## COUNSEL

Anne C. Hsieh (argued), Assistant United States Attorney; Merry J. Chan, Chief, Appellate Section, Criminal Division; Ismail J. Ramsey, United States Attorney; Office of the United States Attorney, United States Department of Justice, San Francisco, California; for Plaintiff-Appellee.

Karen L. Landau (argued), Law Offices of Karen L. Landau, Moraga, California; Elizabeth Richardson-Royer (argued), Law Office of Elizabeth Richardson-Royer, San Francisco, California; for Defendants-Appellants.

## OPINION

BRESS, Circuit Judge:

For their roles in a shootout that left a man dead, Robert Manning and Jamare Coats were each convicted of one count of murder in aid of racketeering, in violation of the Violent Crimes in Aid of Racketeering Activity (VICAR) statute. 18 U.S.C. § 1959(a). Each defendant was also convicted of possession of a firearm by a convicted felon. *Id.* § 922(g)(1). We hold that the district court correctly concluded that it lacked authority to bifurcate the trial of different elements of a single VICAR murder charge. The district court likewise did not err in rejecting defendants' challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), to the government's striking of a juror. For the reasons set forth in this opinion and our accompanying memorandum disposition, we affirm defendants' convictions.

I

Robert Manning and Jamare Coats were known to be active members of Mac Block, a gang associated with the 1100 blocks of McAllister and Fillmore Streets in San Francisco's Fillmore District. Individuals involved in Mac Block, also known as the SWISS, would commit crimes in the area, possess firearms, and oppose other gangs.

On March 23, 2019, Manning attended a funeral reception in the Fillmore with two of his Mac Block associates, Sean Harrison and Donte Armstrong. After leaving the reception and returning with Coats and a few others, Armstrong had a heated argument with another attendee, Misterdee Simmons. Simmons eventually pulled out a gun and threatened Armstrong and Manning. Manning

then left the reception with Harrison and Coats, and Manning and Harrison retrieved two pistols from Manning's car. Coats also retrieved a firearm from his own car. The three then returned to the reception.

After attempts by others to calm the situation, a gunfight broke out. Simmons fired at Harrison, and Harrison and Coats both shot at Simmons. Manning did not fire any shots. Simmons was struck by eleven bullets and killed. Four bystanders were also shot, one of whom was rendered paraplegic.

Manning and Coats were each charged with one count of VICAR murder and one count of being a felon in possession of a firearm and ammunition. Manning's VICAR murder charge was based on the theory that he aided and abetted Harrison's murder of Simmons (Harrison pleaded guilty to a lesser charge). A jury convicted Manning and Coats on all counts. The district court denied defendants' motions for a new trial and for acquittal, sentencing both to life in prison.

Manning and Coats appeal. We have jurisdiction under 28 U.S.C. § 1291.

## II

We first address defendants' argument that the district court erred in concluding that it lacked the authority to bifurcate the trial on the different elements of VICAR murder. In defendants' view, the district court should have first held a trial on whether Manning and Coats were responsible for Simmons' murder, and then, if defendants were found guilty of that murder, proceeded to a second phase on the remaining VICAR murder elements.

We review a district court's denial of a motion to bifurcate for abuse of discretion. *United States v. Nguyen*,

88 F.3d 812, 818 (9th Cir. 1996).  But "[w]e review *de novo* a district court's ruling that it lacks legal authority to exercise its discretion."  *United States v. Salemo*, 81 F.3d 1453, 1460 (9th Cir. 1996).  We hold that, as the district court concluded, defendants' request to bifurcate the trial on the different elements of a single VICAR murder charge fails under *United States v. Barker*, 1 F.3d 957 (9th Cir. 1993), *opinion amended on denial of reh'g*, 20 F.3d 365 (9th Cir. 1994).

## A

The VICAR statute punishes murder and other crimes committed "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a).  The elements of a VICAR offense are "(1) that the criminal organization exists; (2) that the organization is a racketeering enterprise; (3) that the defendants committed a violent crime; and (4) that they acted for the purpose of promoting their position in the racketeering enterprise."  *United States v. Bracy*, 67 F.3d 1421, 1429 (9th Cir. 1995); *see also United States v. Elmore*, 118 F.4th 1193, 1199 (9th Cir. 2024); *United States v. Fernandez*, 388 F.3d 1199, 1220 (9th Cir. 2004), *modified*, 425 F.3d 1248 (9th Cir. 2005).

VICAR murder requires the government to first show that the defendant committed murder "in violation of the laws of any State or the United States." 18 U.S.C. § 1959(a); *see also Elmore*, 118 F.4th at 1199 (explaining that the violent crime element requires "proof that a defendant has committed one of the enumerated offenses, in violation of state or federal law").  The government must then show the requisite connection between the murder and a racketeering enterprise.

This initially requires the government to prove the existence of "an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). VICAR defines "racketeering activity" with reference to 18 U.S.C. § 1961, which is the definition used in the Racketeer Influenced and Corrupt Organizations Act of 1970 (RICO). *See id.* § 1959(b)(1). Section 1961 provides a lengthy list of wrongful conduct that qualifies as "racketeering activity."

VICAR then defines "enterprise" to include "any union or group of individuals associated in fact although not a legal entity." *Id.* § 1959(b)(2). "To establish the existence of such an enterprise, [the government] must provide both 'evidence of an ongoing organization, formal or informal,' and 'evidence that the various associates function as a continuing unit.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007) (en banc) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)) (construing enterprise in the analogous RICO context). To prove VICAR purpose—that the murder was "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity," 18 U.S.C. § 1959(a)—the "gang or racketeering enterprise purpose does not have to be the only purpose or the main purpose of the murder or assault. But it does have to be a substantial purpose." *United States v. Banks*, 514 F.3d 959, 969 (9th Cir. 2008); *see also United States v. Rodriguez*, 971 F.3d 1005, 1009–1010 (9th Cir. 2020).

The government's theory at trial was that Mac Block was "an association in fact" united by a common purpose of committing crimes in and around the Fillmore District and defending Mac Block territory. The government further maintained that defendants killed Simmons for the purpose of promoting and maintaining their position in the

racketeering enterprise—that is, to burnish their reputations and standing with other Mac Block members and to demonstrate that Mac Block would not tolerate someone like Simmons publicly disrespecting them in the Fillmore.

To prove that Mac Block was "an enterprise engaged in racketeering activity," 18 U.S.C. § 1959(a), the government introduced evidence of Mac Block's organizational structure and practices through the testimony of accomplice Harrison, former San Francisco gang member Johnny Brown, and San Francisco Police Department Sergeant Thomas Moran. This included, following the district court's balancing under Federal Rule of Evidence 403, testimony about specific prior acts of Mac Block racketeering, among them Manning and Coats evading police in a high-speed chase, Coats firing shots in the street, and Mac Block members committing an armed robbery of a marijuana dispensary. Some of these past acts involved Manning and Coats, but others involved different members of Mac Block.

Before trial, and in the course of evaluating which enterprise acts to allow into evidence consistent with Rule 403, the district court sua sponte raised the possibility of bifurcating the trial of VICAR's violent crime element (i.e., murder) from the remaining VICAR elements. Under that procedure, the district court explained, "the jury would first determine whether or not a murder had occurred, and, if it so found, would then hear further evidence concerning racketeering acts and the enterprise and determine whether the murder was done for 'the purpose of gaining entry to, maintaining or increasing position in' an enterprise." Taking up the district court's idea, defendants moved to bifurcate the trial in this manner on the theory that evidence about Mac Block's other wrongdoing, and defendants' involvement in

it, would prejudice the jury's consideration of whether defendants were responsible for Simmons's murder.

The district court denied the bifurcation motion, concluding that our decision in *United States v. Barker*, 1 F.3d 957 (9th Cir. 1993) forbade bifurcated trials of elements of a single criminal charge. Although the district court would have preferred to sever the trial but for *Barker*, the court viewed *Barker* as controlling. As the district court explained, "[t]he government presents [*Barker*] as an across-the-board absolute rule that bifurcation cannot be allowed, at least as applied to this case. And I've read the *Barker* decision, and I believe that the government is correctly reading it." Although the district court found it "sad that the Court of Appeals would have such a broad statement," it concluded that "the Court of Appeals has spoken in the *Barker* case, and I cannot see an honest, intellectually honest way to get around it." The district court went on to offer some criticisms of *Barker*, opining that *Barker* was wrongly decided. In the district court's view, *Barker* improperly prevented trial courts from employing bifurcated proceedings to conserve resources and alleviate undue prejudice to defendants, in this case from the evidence of past racketeering acts.

Because the district court viewed itself as unable to bifurcate proceedings on the VICAR elements under *Barker*, it took other steps to mitigate the perceived prejudice from the enterprise acts evidence. Most notably, the district court gave cautionary instructions to the jury throughout the government's presentation of prior Mac Block racketeering

acts, and then included the following admonition in the jury instructions:

> You have heard evidence regarding acts that took place before 2019. As I instructed you, you may consider this evidence only for the limited purpose of determining whether or not the government has proven the alleged racketeering enterprise, its general function, and the defendant's association with it. Therefore, you must consider it only for that limited purpose and not for any other purpose. You may not consider those acts with respect to the homicide of Misterdee Simmons on March 23, 2019, including issues of intent and purpose.

The district court also sequenced the presentation of evidence, so that the "the racketeering acts were presented back-to-back well after all the evidence concerning the murder." The district court observed, in denying defendants' motions for a new trial, that this staging of the evidence made it "easier for the jury to compartmentalize and to heed the cautionary instruction."

## B

We agree with the district court that *Barker* precludes bifurcation of the trial on the different elements of a single VICAR murder charge.

In *Barker*, Alvin Barker was charged with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). 1 F.3d at 958. That provision criminalizes the possession of firearms or ammunition by one "who has been convicted in

any court of[] a crime punishable by imprisonment for a term exceeding one year." 18 U.S.C. § 922(g)(1). At trial, Barker "moved to bifurcate the 'possession' element of the crime from the 'felon' element of the crime" based on his concern that evidence of his prior conviction would prejudice him. *Barker*, 1 F.3d at 958. The government agreed to stipulate to Barker's prior felony but sought to have the jury instructed on all elements of the crime. *Id.*

The district court sided with Barker, ordering a bifurcated trial in which Barker would stipulate to a prior felony conviction only if the jury first convicted him of possession of a firearm, which the jury would have to do without any knowledge of Barker's felon status. *Id.* As part of this procedure, the court would instruct the jury in the first trial phase that "the parties have agreed that mere possession [of the firearm] is criminal in this case and it is not for [the jury] to decide the wisdom of such a law." *Id.* (alteration in original). But the indictment "would not (and indeed could not) be read to the jury." *Id.*

The government immediately appealed the bifurcation order. Invoking the "extraordinary remedy" of mandamus, we "join[ed] several other circuits" to "hold that the district court may not bifurcate the single offense of being a felon in possession of a firearm into multiple proceedings." *Id.* at 959 (citing *United States v. Gilliam*, 994 F.2d 97, 101–02 (2d Cir. 1993); *United States v. Birdsong*, 982 F.2d 481, 482 (11th Cir. 1993) (per curiam); *United States v. Collamore*, 868 F.2d 24, 28 (1st Cir. 1989), *overruled on other grounds by United States v. Tavares*, 21 F.3d 1 (1st Cir. 1994) (en banc); *United States v. Aleman*, 609 F.2d 298, 310 (7th Cir. 1979), *superseded by statute on other grounds as stated in Jake v. G.L. Herschberger*, 173 F.3d 1059 (7th Cir. 1999);

*United States v. Brinklow*, 560 F.2d 1003, 1006 (10th Cir. 1977)).

We gave several reasons for our decision in *Barker*. *First*, we concluded that "[t]he district court's order change[d] the very nature of the charged offense" and "remove[d] an element of the crime from the jury's consideration." *Id.* at 959. Indeed, we reasoned, "[a]ny other holding would lead to an impermissible result" if the jury did not find that Barker had possessed the firearm, as this outcome would prevent the government "from proving an essential element of the charged offense, and the district court would breach its duty to instruct the jury on all the essential elements of the crime charged." *Id.* Here we favorably relied on the Second Circuit's observation in a similar case rejecting bifurcation that "[t]here is a significant difference . . . between a rule formulated to limit the admissibility of potentially prejudicial evidence and a rule that eliminates an element of a crime legislated by Congress." *Id.* (quoting *Gilliam*, 994 F.2d at 102).

*Second*, and related to the first point, we explained that "[l]imiting the jury's consideration of required elements of an indicted offense is contrary to the presumption against special verdicts in criminal cases." *Id.* (citing *United States v. Aguilar*, 883 F.2d 662, 690 (9th Cir. 1989), *superseded by statute on other grounds as stated in United States v. Gonzalez-Torres*, 309 F.3d 594, 599 (9th Cir. 2002)). Although *Barker* did not elaborate on this point, it cited *Aguilar*, which explained that although "there may be cases" in which special verdicts are "appropriate," "it has long been the law that 'it is not the practice of the Federal Courts in criminal cases to call for special verdicts.'" *Aguilar*, 883 F.2d at 690 (quoting *United States v. Jones*, 425 F.3d 1048, 1057 (9th Cir. 1970)). In the same way that special verdict

forms can be too intrusive of the jury's internal processes in criminal cases, *see, e.g.*, *United States v. Reed*, 147 F.3d 1178, 1180 (9th Cir. 1998), bifurcation of the elements of a single criminal charge into two or more trials could lead to a framing of the case that unduly restricts the jury's role. The First and Second Circuits, whose decisions we favorably cited in *Barker*, made a similar point in rejecting an identical request for bifurcation. *See Gilliam*, 994 F.2d at 101; *Collamore*, 868 F.3d at 28.

*Third*, *Barker* justified its rejection of the district court's bifurcation order on the ground that it "might unfairly confuse the jury, prompting it to exercise its power of nullification on the unwarranted belief that the defendant was charged for noncriminal conduct." 1 F.3d at 959. Because gun ownership is presumptively lawful, *Barker* explained that a jury in a bifurcated § 922(g) case, when first deciding whether the defendant possessed a gun, might "question whether what the accused did was a crime." *Id.* (quoting *Collamore*, 868 F.2d at 28).

Manning and Coats argue that *Barker* "should be limited to its facts" and, most specifically, to § 922(g) felon-in-possession cases. But *Barker* gave no indication that it should be interpreted in such a limited way. Defendants identify no reasoned decision that has adopted their proposed bifurcation procedure as to the elements of a single criminal offense. And although defendants maintain that "it might be that bifurcation is *only* appropriate in VICAR cases," they identify no VICAR cases that have done this, either.

Like the district court, we believe that a faithful reading of *Barker* forecloses defendants' argument. The reason is that *Barker*'s core rationale transcends § 922(g) or any particular criminal offense. A central animating principle of

*Barker* is that bifurcating the trial on the elements of a single criminal charge would redefine the offense itself, "chang[ing] the very nature of the charged offense" and "'eliminat[ing] an element of a crime legislated by Congress.'" 1 F.3d at 959 (quoting *Gilliam*, 994 F.2d at 102). In the process, it would unduly "[l]imit[] the jury's consideration of required elements of an indicted offense," analogous to the restraints on jury decision-making that special verdict forms can impose. *Id.* And if "a jury did not return a guilty verdict" in the first part of the bifurcated proceeding, "[t]he government would be precluded from proving an essential element of the charged offense." *Id.* These rationales apply just as well to VICAR cases. Although we appreciate the district court's studious criticism of our decision in *Barker*, as a three-judge panel we must adhere to *Barker*, just as the district court itself did. *See Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). Regardless, we think the rationales in *Barker*—most centrally our obligation to treat criminal offenses as Congress has defined them—must of necessity outweigh the concerns that the district court raised.

The worry driving Manning and Coats's request for bifurcation, as amplified by the district court, is that evidence of an enterprise's past racketeering activities creates prejudice for defendants in VICAR cases. But just as in *Barker*, defendants "misunderstand[] the fundamental nature of 'prejudicial evidence.'" *Id.* at 959 n.3. The defendant in *Barker* argued that his prior felony conviction was prejudicial in a § 922(g) case, but we rejected this, explaining that "[a] prior conviction is not prejudicial when it is an element of the charged crime." *Id.*

That same logic applies to evidence of an enterprise's racketeering activities, because the government must prove

under VICAR the existence of "an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a); *see also Bracy*, 67 F.3d at 1429. Inasmuch as defendants' prejudice objection arises from the way Congress defined the VICAR offense, under *Barker* this provides no justification for bifurcating the trial on the elements of a single VICAR charge. And to the extent defendants' concern is that jurors might link the past racketeering activities to the charged murder, the district court's instructions specifically told jurors not to consider that evidence "with respect to the homicide of Misterdee Simmons on March 23, 2019, including issues of intent and purpose." *Cf. United States v. Ovsepian*, 113 F.4th 1193, 1201 (9th Cir. 2024) ("We 'presume that jurors follow the jury instructions.'" (quoting *Doe v. Busby*, 661 F.3d 1001, 1017 (9th Cir. 2011))).[1]

Finally, Manning and Coats argue that *Barker* should not govern because *Barker* contemplated the possibility that a jury in the first phase of a bifurcated trial might engage in nullification after concluding that the defendant's conduct (possession of a gun) was not unlawful. Defendants point out that here there is no question that murder is unlawful. We again align with the district court in viewing *Barker* as controlling.

It is true that *Barker*'s concern that jurors might acquit "on the unwarranted belief that the defendant was charged for noncriminal conduct," *Barker*, 1 F.3d at 959, does not apply in this case. But this was only one of our rationales in *Barker*. It was by no means our driving rationale. We prefaced our discussion of jury nullification with

---

[1] The government argues that the district court's limiting instruction was itself excessive and that it unduly constrained the jury's consideration of the VICAR murder charge. We have no occasion to consider that issue.

"Additionally, . . .," and devoted one sentence of analysis and a block quote to the issue. *Id.* And this discussion followed our core critique that the district court's bifurcation order in *Barker* "change[d] the very nature of the charged offense" and would lead the district court to "breach its duty to instruct the jury on all the essential elements of the crime charged." *Id.*

Indeed, when we later rejected a similar bifurcation request in *Nguyen*, we noted that "[t]here are *various* legitimate reasons for not allowing bifurcation of the offense of being in possession of a firearm into separate proceedings," listing "[f]irst of all" that the "'government would be precluded from proving an essential element of the charged offense, and the district court would breach its duty to instruct the jury on all the essential elements of the crime charged.'" 88 F.3d at 818 (quoting *Barker*, 1 F.3d at 959) (emphasis added). Nothing in *Barker* suggests that the possibility of jurors doubting the criminal nature of the conduct is a necessary condition for rejecting bifurcation on the elements of a single criminal offense. And to the extent defendants ask us to adopt such a reading of *Barker*, we reject that request, which would not be true to the *Barker* decision as a whole.

Moreover, our concern in *Barker* with juror nullification arose from a broader concern that "the district court's bifurcation order might unfairly confuse the jury." *Id.* Juror confusion would be an issue here, too, albeit for a different reason than in *Barker*. Requiring jurors to first decide whether Manning and Coats were responsible for Simmons's murder, without any evidence of VICAR enterprise or purpose, would force jurors to view the facts of this case in an artificially constrained light, leaving jurors with little understanding of why Manning and Coats might

have killed (or aided or abetted the killing of) Simmons. This would hamstring the government in its ability to explain defendants' intent and motive. And it would impede the jury's understanding of what happened and why. *See Old Chief v. United States*, 519 U.S. 172, 189 (1997) ("People who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters, and jurors asked to rest a momentous decision on the story's truth can feel put upon at being asked to take responsibility knowing that more could be said than they have heard."). Depriving the jury of key context hardly gives effect to Congress's articulation of the offense of VICAR murder.

We therefore hold that under *Barker*, the district court lacked the authority to bifurcate the trial on the elements of a single VICAR murder offense.

## C

Our decision today is consistent with the many courts that have rejected requests to bifurcate the trial of the elements of a single criminal offense.

Every circuit to address bifurcation in the § 922(g) context is in accord with *Barker*. As we noted above, per *Barker*, *see* 1 F.3d at 959, the First, Second, Seventh, Tenth, and Eleventh Circuits had already ruled consistent with *Barker* before our decision in that case (in some cases concerning the statutory predecessor to § 922(g)). *See Gilliam*, 994 F.2d at 101–02; *Birdsong*, 982 F.2d at 482; *Collamore*, 868 F.2d at 28; *Aleman*, 609 F.2d at 310; *Brinklow*, 560 F.2d at 1006; *see also United States v. Amante*, 418 F.3d 220, 224 (2d Cir. 2005), *abrogated on other grounds by Rehaif v. United States*, 588 U.S. 225 (2019); *United States v. Dean*, 76 F.3d 329, 332 (10th Cir.

1996); *Tavares*, 21 F.3d at 3 ("[W]e stand by and reaffirm the proposition central in *Collamore . . . .*").

Since *Barker*, the Third, Fourth, Eighth, and D.C. Circuits have likewise rejected the bifurcation argument in the § 922(g) context. *See United States v. Jacobs*, 44 F.3d 1219, 1222–23 (3d Cir. 1995); *United States v. Milton*, 52 F.3d 78, 80–81 (4th Cir. 1995), *overruled on other grounds by United States v. Wilks*, 647 F.3d 520 (4th Cir. 2011); *United States v. Koskela*, 86 F.3d 122, 125–26 (8th Cir. 1996); *United States v. Clark*, 184 F.3d 858, 867 (D.C. Cir. 1999); *United States v. Mangum*, 100 F.3d 164, 171 & n.11 (D.C. Cir. 1996). And the Sixth Circuit has concurred in a reasoned but unpublished disposition. *See United States v. Underwood*, 1996 WL 536796, at *6 (6th Cir. Sept. 20, 1996) ("Most other circuits follow the *Barker* rule. Although this court has not previously adopted that rule, we do so today.") (citations omitted); *see also United States v. Moore*, 376 F.3d 570, 573 (6th Cir. 2004) (citing *Underwood*).

As the Fourth Circuit summarized, "[n]umerous courts have held that if a defendant is charged with being a felon-in-possession of a firearm, a district court does not have the power to instruct the jury to consider only the possession element of the offense." *Milton*, 52 F.3d at 80; *see also United States v. Higdon*, 638 F.3d 233, 244 n.8 (3d Cir. 2011), *abrogated on other grounds by Rehaif v. United States*, 588 U.S. 225 (2019) ("Since our decision in *Jacobs*, every appellate court that has addressed whether a single count indictment under § 922(g)(1) should be entitled to a bifurcated trial has rejected the idea."); *Mangum*, 100 F.3d at 171 n.11 ("A number of our sister circuits have reached the same conclusion on this issue.").

Like *Barker*, these decisions employed reasoning that goes beyond § 922(g).  As the First Circuit explained, "[t]he parties have not cited, and we have been unable to locate, . . . a single case allowing, much less mandating, bifurcation of a trial by dividing it along the lines of the elements of the crime charged."  *Collamore*, 868 F.2d at 27.  In fact, the First Circuit noted, "other statutes call for the introduction of other crimes as an element of a substantive offense, but as far as we know, there has been no bifurcation in those cases."  *Id.* at 28 (citation and footnote omitted).  In addition, and as we did in *Barker*, many of the cases from other circuits emphasize the fact that bifurcation along the lines proposed by Manning and Coats would alter the elements of the offense as Congress defined it, a concern that is not limited to § 922(g).  *See, e.g.*, *Jacobs*, 44 F.3d at 1223; *Milton*, 52 F.3d at 81; *Gilliam*, 994 F.2d at 102.  Indeed, the Second Circuit has stated without qualification that "in criminal cases there is no bifurcation, at least as to each count of an indictment."  *United States v. Yakobowicz*, 427 F.3d 144, 152 (2d Cir. 2005).[2]

The bifurcation-of-elements issue has been raised less often outside of § 922(g).  *See Birdsong*, 982 F.2d at 482 (noting that such requests are "extremely rare").  Nevertheless, courts have likewise rejected defendants' same argument in the context of other criminal laws.  The

---

[2] The Second Circuit has elsewhere stated in dicta, in the § 922(g) context, that it did "not rule out bifurcation where the facts underlying the prior felony would be presented to the jury and are so heinous as to overwhelm the trial of firearm or ammunition possession."  *Amante*, 418 F.3d at 224.  We have never offered this or any similar caveat, nor does it appear the Second Circuit has found the "extraordinarily unusual" case to which this possible exception would apply.  *Id.* at 225 (quoting *United States v. Belk*, 346 F.3d 305, 311 (2d Cir. 2005)).

D.C. Circuit considered the issue in *United States v. Rezaq*, 134 F.3d 1121 (D.C. Cir. 1998), in the case of aircraft piracy under then-49 U.S.C. § 1472(n) (1994). At the time, the statute criminalized, "while aboard an aircraft in flight . . . unlawfully, by force or threat thereof, or by any other form of intimidation, seiz[ing], or exercis[ing] control of [an] aircraft." *Id.* at 1127 (quoting 49 U.S.C. § 1472(n)(2)(A)). The statute imposed a minimum sentence of death or life imprisonment "if the death of another person results." *Id.* (quoting 49 U.S.C. § 1472(n)(1)(B)).

The defendant requested a bifurcated proceeding in which the jury would "first consider whether he had committed the offense of air piracy" before deciding "whether the 'death results' provision" applied. *Id.* at 1134. In the defendant's view, the "death results" provision was a penalty enhancement and not an element of the offense. *Id.* After concluding, as a matter of statutory interpretation, that the "death results" provision "must be classified as an element of a substantive offense," the D.C. Circuit "affirm[ed] the district court's ruling that [the defendant] was not entitled to a bifurcated proceeding." *Id.* at 1137. The D.C. Circuit effectively treated as given that once it was decided that the "death results" provision was an element of the offense, bifurcating the elements of a single aircraft piracy charge would have been improper.

District courts have also rejected requests to bifurcate the trial of elements of the same offense in the contexts of a variety of different criminal statutes. *See United States v. Andrews*, 2013 WL 6230450, at *1–3 (N.D. W. Va. Nov. 26, 2013) (rejecting request to bifurcate trial on different elements of a single charge for murder by a federal prisoner serving a life sentence, 18 U.S.C. § 1118, and noting that "[a]lthough the legal principle that evidence of one element

of an offense cannot create prejudice as to another element of the same offense is contained within felon-in-possession cases, it is broadly applicable"); *United States v. Cassim*, 693 F. Supp. 2d 697, 700 (S.D. Tex. 2010) (rejecting request to bifurcate trial on different elements of single criminal copyright conspiracy charge); *United States v. Lunceford*, 2009 WL 2634479, at *2–3 (S.D. Ala. Aug. 21, 2009) (rejecting request for bifurcated trial on different elements of a single federal arson charge); *United States v. Westry*, 2006 WL 538885, at *1–3 (S.D. Ala. Mar. 3, 2006) (rejecting request for bifurcated trial on different elements of a single drug conspiracy charge under 21 U.S.C. § 846, and noting that "dividing a trial to split apart the presentation of evidence of different elements of the same offense into different phases" is "rarely, if ever, appropriate").

In short, our conclusion that the district court could not bifurcate the trial of elements of a single VICAR murder charge not only follows inexorably from our decision in *Barker*, but is broadly consistent with the body of precedent on this type of bifurcation question.

## D

Defendants point out that bifurcation-type procedures have been used in other contexts. But those contexts are readily distinguishable.

Defendants note, for example, that courts have bifurcated the trial of different criminal offenses, *see, e.g.*, Fed. R. Crim. P. 14(a); *United States v. Prigge*, 830 F.3d 1094, 1098 (9th Cir. 2016); the guilt and penalty phases in capital cases, *see, e.g.*, *United States v. Haymond*, 588 U.S. 634, 647 (2019); *Brown v. Sanders*, 546 U.S. 212, 214 (2006); *Adams v. Texas*, 448 U.S. 38, 40 (1980); sentencing

enhancement proceedings,[3] *see, e.g.*, *Spencer v. Texas*, 385 U.S. 554, 563, 567–68 (1967); and in cases involving the insanity defense, *see, e.g.*, *Collamore*, 868 F.2d at 27. But none of these situations involves the bifurcation of trial on the elements of a single criminal offense. They therefore do not present the same concerns we identified in *Barker*. Nothing in *Barker* or our decision today casts doubt on longstanding bifurcation practices in situations that do not involve delimiting the jury's consideration of the elements of a single criminal offense, as Congress conceived it.

Defendants also correctly note that bifurcation of issues at trial can occur in civil cases. But in the civil context, the Federal Rules of Civil Procedure specifically provide that "[f]or convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b). As the First Circuit observed in rejecting a bifurcated trial on the elements of a single § 922(g) offense, it is "significant that the civil rules expressly allow separate trials of separate issues, i.e., bifurcation, Fed. R. Civ. P. 42(b), while the criminal rules are silent on the subject." *Collamore*, 868 F.2d at 28.

Defendants also point to two cases allegedly approving of bifurcation in the criminal and civil RICO contexts. *See United States v. Coonan*, 839 F.2d 886 (2d Cir. 1988);

---

[3] The Supreme Court recently referenced bifurcation of proceedings in Armed Career Criminal Act (ACCA) cases in *Erlinger v. United States*, 602 U.S. 821, 847 (2024). But that was in the context of a sentencing enhancement. *See id.* (citing *Spencer*, 385 U.S. at 567); *United States v. Bonat*, 106 F.3d 1472, 1478 (9th Cir. 1997). Thus, *Erlinger* does not support defendants' position.

*Conkling v. Turner*, 18 F.3d 1285 (5th Cir. 1994). But neither of these cases endorsed bifurcating the trial of separate elements of a single criminal offense. *Coonan* involved the district court's limited use of a special verdict and special interrogatories in a manner that did "not remove any actual factfinding from the province of the jury." 839 F.2d at 888–90, 889 n.3. *Conkling*, meanwhile, was a civil case involving the application of Federal Rule of Civil Procedure 42(b). *See* 18 F.3d at 1293–94.

Nor is it true that bifurcation is the only means of avoiding undue prejudice to defendants in VICAR murder cases. As this case demonstrates, district courts have other means at their disposal to address undue prejudice associated with the presentation of past racketeering acts, including limiting instructions and the sequencing of the government's case. What district courts cannot do under *Barker*, as the district court here rightly recognized, is bifurcate the trial on the elements of a single VICAR murder charge. We reaffirm *Barker* and reject defendants' position on bifurcation. And even if *Barker* did not strictly govern (it does), we would still find that the reasoning of *Barker* and the other supportive authorities we have cited is correct as a matter of law and leads to the same result.

E

The dissent would hold that *Barker* does not control and that the district court should have bifurcated the murder element from the remaining VICAR elements. The dissent gravely misreads *Barker*, offers reasoning that directly conflicts with *Barker*, and would usher in a revolutionary change in federal criminal procedure that no court has seen fit to enact. *Barker* has been on the books for over thirty years, and there is no indication that anyone has understood

it differently than we have (or the district court did). In fact, the dissent identifies no precedent from any court that supports its position. And for all the dissent's reliance on supposedly pragmatic concerns, its proposed regime would be entirely unworkable.

The dissent is simply wrong that "*Barker*'s guiding rationales . . . were specific to the felon-in-possession charge and the proposed bifurcation plan there at issue." Dissent 49. *Barker* concluded that "[t]he district court's order change[d] the very nature of the charged offense" and "remove[d] an element of the crime from the jury's consideration," with the district court "breach[ing] its duty to instruct the jury on all the essential elements of the crime charged." *Id.* at 959. These rationales were by no means limited to § 922(g)(1) or to particular kinds of crimes. The dissent repeatedly feigns a lack of comprehension of our reasoning. *E.g.*, Dissent 57 ("To the extent I can understand these arguments . . . ."). But we have merely quoted what *Barker* said. And *Barker*'s reasoning has not been lost on the many courts that have followed it, including the district court below.

Nor is the dissent correct that "the nullification concern was the cornerstone of *Barker*'s conclusion." Dissent 51. *Barker* discussed nullification only after explaining that the district court's order "change[d] the very nature of the charged offense." 1 F.3d at 959. And as we recounted above, *Barker* discussed jury nullification in a single sentence (prefaced with "Additionally, . . .") and a quote of another case, before returning to its core reasoning: "The bifurcation order removes an element of the crime from the jury's consideration, prevents the government from having its case decided by the jury, and changes the very nature of the charged crime." *Id.*

As we later explained in *Nguyen*, "[t]here are *various legitimate* reasons for not allowing bifurcation," including, "*[f]irst of all*," the concern that bifurcation would prevent the government "'from proving an essential element of the charged offense'" and would breach the district court's "'duty to instruct the jury on all the essential elements of the crime.'" *Nguyen*, 88 F.3d at 818 (emphasis added) (quoting *Barker*, 1 F.3d at 959). The dissent claims that jury nullification is "[t]he strongest justification for *Barker*'s holding" and its "most convincing" rationale. Dissent 50, 52. We do not agree, but the broader point is that it is not up to us to decide which rationales in a prior decision are strongest and most convincing, or to read an opinion in an unduly narrow way based on our own conclusions about which part of the opinion is more persuasive.

Indeed, much of the dissent devolves into what is transparently a disagreement with *Barker* itself. For example, *Barker* explained that "[l]imiting the jury's consideration of required elements of an indicted offense is contrary to the presumption against special verdicts in criminal cases." 1 F.3d at 959. The dissent concedes that bifurcation "would be functionally similar to a two-question special interrogatory" on a special verdict form. Dissent 54. But it then claims that "[s]pecial verdicts are avoided in order to protect *defendants*," and complains that neither we "nor *Barker*" explain how a special verdict-like bifurcation procedure "would sway the jury toward a guilty verdict or otherwise infringe a defendant's jury trial rights." Dissent 53–54.

Regardless of how the dissent understands the presumption against special verdicts, *Barker* invoked the presumption in ruling *for the government* and in *rejecting bifurcation*, which would have favored the defendant.

*Barker* plainly invoked the presumption not because special verdicts harm defendants, but because special verdicts unduly restrict a jury's role, as would be the case if the elements of a single criminal charge were bifurcated. *See Barker*, 1 F.3d at 959 (explaining, immediately after its reference to special verdicts, that "[t]he bifurcation order removes an element of the crime from the jury's consideration, prevents the government from having its case decided by the jury, and changes the very nature of the charged crime"); *see also Gilliam*, 994 F.2d at 101 ("The jury must know why it is convicting or acquitting the defendant, because that is simply how our judicial system is designed to work. Removing an element of a crime from a jury's deliberation would be similar to allowing the jury to render a special verdict."). The dissent says we "ignore[] the permissibility and utility of special verdicts," Dissent 56, but we merely rely on *Barker*, which invoked a non-crime-specific "presumption against special verdicts." 1 F.3d at 959. The dissent therefore errs in discerning an "obvious tension between *Barker*'s jury nullification rationale and its no-special verdicts rationale." Dissent 55 n.10. There is no such tension given the way in which *Barker* invoked special verdicts. It is the dissent that manufactures the tension through its misreading of *Barker*.

Another example of the dissent's refusal to follow *Barker* lies in its contention that if jurors in a bifurcated trial concluded that Manning and Coats did not commit a murder, there would be no improper redefinition of the VICAR crime or elimination of its enterprise element because a defendant who has not committed a predicate crime is innocent of the VICAR charge. Dissent 59. A § 922(g)(1) felon-in-possession defendant similarly cannot be guilty if the possession element is not met, but *Barker* held that

bifurcation redefines the crime all the same. As *Barker* made clear, "if a jury *did not* return a guilty verdict on the possession portion of the crime," "[t]he government would be precluded from proving an essential element of the offense, and the district court would breach its duty to instruct the jury on the essential elements of the crime charged." 1 F.3d at 959 (emphasis added). The dissent simply attempts to re-litigate *Barker*.[4]

In the process, the dissent does exactly what *Barker* tells us not to do: redefine the offense as Congress has conceived it. The dissent says that a rule against bifurcation is inconsistent with Congress's intent because the VICAR statute incorporates state law predicate offenses, and consideration of elements beyond those of a state law offense "expands the definition" of the underlying offense.

---

[4] The dissent is also incorrect that *Barker*'s rationale turned on the fact that the defendant there intended to stipulate to the fact of his prior felony conviction if the jury found he possessed a gun. Dissent 57–58 & n.13, 65. It was not the stipulation that "eliminate[d] an element" of the felon-in-possession charge. *Barker*, 1 F.3d at 959 (quoting *Gilliam*, 994 F.2d at 102). Our concern in *Barker* was that the government would "be precluded from proving an essential element of the charged offense," whether that took the form of "proof through stipulation or contested evidence." *Id.* at 959 & n.3. In other words, the problem in *Barker* was not the stipulation itself—it was that the stipulation, which was evidence of an essential element, would be kept from the jury in the first phase of the trial. This was why the "impermissible result" occurred "if a jury *did not* return a guilty verdict." *Id.* at 959 (emphasis added). Thus, the fact that *Barker* involved "proof through stipulation" rather than by "contested evidence" is irrelevant. *See id.* at 959 n.3. In either case, bifurcation impermissibly withholds an element of the offense from the jury, preventing the jury from rendering a verdict with full knowledge of the nature of the offense. *Id.* at 959. It is therefore beside the point, as the dissent claims, that Manning and Coats did not propose to stipulate to any of the elements of the VICAR offense. Dissent 65.

Dissent at 60–61. But the offense at issue is *not* the *state law* offense. It is the *federal* VICAR offense, as Congress has defined it, with its predicate offense, enterprise element, and all. Indeed, § 922(g)'s prior felony element likewise incorporates state law violations, *see* 18 U.S.C. § 922(g)(1), despite which it is still treated as "an element of a crime legislated by Congress." *Barker*, 1 F.3d at 959 (quoting *Gilliam*, 994 F.2d at 102).

Nor is the statute "a sentencing enhancement" for certain predicate crimes. Dissent 47. The offense is the commission of certain crimes "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a). In analogizing the entire offense to a sentence enhancement, the dissent would again redefine the statute. The dissent's related insistence that bifurcation is a merely procedural matter that does "not alter Congress's substantive definition of a criminal offense," Dissent at 61, is also flatly contradicted by *Barker*. *See Barker*, 1 F.3d at 959 ("The bifurcation order . . . changes the very nature of the charged crime."). Jurors in the first phase of the dissent's envisioned trial would be asked to decide matters without even knowing the nature of the charged federal offense.

We see substantially the same error in the dissent's frequently reiterated assertion that bifurcation should be allowed because VICAR enterprise acts evidence could be prejudicial to the defense. Dissent 40, 54, 56, 61–62, 64–66. The existence of a racketeering enterprise is an element of the charged offense in this case. 18 U.S.C. § 1959(a); *Bracy*, 67 F.3d at 1429. So too was the prior felony conviction in *Barker*. Yet *Barker* was crystal clear that "[a] prior conviction is not prejudicial when it is an element of the charged crime." *Barker*, 1 F.3d at 959 n.3. Like the

defendant in *Barker*, the dissent "misunderstands the fundamental nature of 'prejudicial evidence.'" *Id.*

For all its improper efforts to avoid *Barker*'s binding force, the dissent falters on another important front as well: the complete lack of precedent favoring its position. *Barker* was decided over three decades ago. The dissent identifies no case, and we are aware of none, that reads *Barker* as the dissent does, or even suggests it could be read that way. The defendants themselves did not think to raise the bifurcation issue until the district court prompted them. And that court, once it had studied the issue, readily concluded—despite plainly wishing to go the other way—that *Barker* advanced "an across-the-board absolute rule that bifurcation cannot be allowed," to the point that it perceived no "intellectually honest way to get around it."

But even beyond the dissent's *Barker* problem, the dissent cites no authority whatsoever, from any jurisdiction, endorsing its position. Back in 1989, the First Circuit was unable to identify "a single case allowing, much less mandating, bifurcation of a trial by dividing it along the lines of the elements of the crime charged." *Collamore*, 868 F.2d at 27. Thirty-five years later, the dissent can muster no such case either. And the dissent, if adopted, would dramatically change federal criminal trials. It would break with long-established precedent and tradition, fundamentally altering both the criminal adjudicatory process and the nature of criminal offenses as Congress has defined them.

And it would leave matters hopelessly muddled, as well, for the dissent's proposed regime is entirely uncertain. In this case, the enterprise acts evidence establishes the existence of the enterprise, its purpose, and its tactics; the evidence is central to the government's explanation of who

defendants are and why they killed Simmons. From the perspective of the elements of the VICAR charge as a whole, the dissent would have the government try its murder case on an artificially sanitized record, with an incomplete understanding of the players and their roles. The dissent says that in its proposed first-phase murder trial, the government "would be free to present any and all evidence (including enterprise evidence) relevant to the murder element and not unfairly prejudicial." Dissent 62. But how would we know which enterprise acts evidence should go in phase one vs. phase two? The dissent's vision is unclear.

This problem would ripple across virtually the entire criminal docket. When might evidence relating to one element be prejudicial to the jury's consideration of another element? One might think *all the time*, given that evidence of criminal wrongdoing is nearly always prejudicial. If the dissent's position were the law, district courts would be confronted with bifurcation requests as a matter of course, with no clarity on when such requests may or must be granted. And when granted, the result would be "separate proceedings [that] would put a strain on judicial economy and require additional resources for duplicative proceedings." *Nguyen*, 88 F.3d at 818. We doubt that the dissent could logically limit its proposal to statutes with a supposedly "unusual crime-within-a-crime structure," Dissent 50, and it is not clear the dissent would do so. Even so, "other statutes call for the introduction of other crimes as an element of a substantive offense, but as far as we know, there has been no bifurcation in those cases." *Collamore*, 868 F.2d at 28 (citations omitted).

*Barker* wisely avoided the many questions the dissent's approach would prompt. And even if we were to question *Barker*, as the district court did, we would be bound to

follow it.  The dissent's contrary position violates circuit precedent, is effectively unknown in federal criminal law, and would plunge courts into a bottomless pit of further inquiries.  We follow *Barker* and affirm the district court's denial of defendants' bifurcation request.

## III

We now switch gears to *Batson*.  Defendants argue that the district court erred in rejecting a *Batson* challenge to the government's peremptory strike of a juror.  "We generally review a district court's *Batson* determination for clear error because of the intrinsically factual nature of the claim." *United States v. Collins*, 551 F.3d 914, 919 (9th Cir. 2009) (citing *Tolbert v. Page*, 182 F.3d 677, 681–82 (9th Cir. 1999) (en banc)).  "However, where the district court applies the wrong legal standard, we review the claim de novo."  *Id.*

## A

The alleged *Batson* violation in this case is based on the government's peremptory strike of prospective juror K.A., who was later determined to be Black.   In her juror questionnaire, and in response to a question about believing or disbelieving the testimony of law enforcement officers, K.A. wrote: "The history and present nature of U.S. policing which is rooted in anti-black racism and the legal system's reliance on the existence of persons ineligible to personhood . . . makes me critical of the opinions and perceptions of law enforcement officers."

During voir dire, the government asked K.A. about this response.   K.A. explained that "I was interpreting the question as if, like, a law enforcement officer gave their testimony, that I might, um, like I would believe that they believe they're telling the truth potentially, but I'm aware

that that is likely biased in its own way." In response to further questioning by the government, K.A. agreed that she had "described U.S. policing as rooted in racism." When the government asked K.A. if she was "going to assume that the work" of law enforcement officers "is rooted in racism," K.A. responded: "Um, I mean, structurally, yes." But K.A. also stated that she did not think her beliefs "affect[ed] [her] ability to . . . assess the facts," and that she could serve as a fair and impartial juror.

After the government used a peremptory strike on K.A., the defense raised a *Batson* objection. The district court then heard argument from the parties. Noting its uncertainty over K.A.'s race and whether she was Black, the district court found that the government's striking of K.A. based on the answer in her questionnaire was race-neutral and not pretextual. After denying defendants' *Batson* motion, the court confirmed with K.A., for clarity on appeal, that she is Black.

## B

Under *Batson v. Kentucky*, "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." 476 U.S. at 89. *Batson* established a three-part burden-shifting framework for determining if the government used a peremptory strike in a racially discriminatory manner. *Foster v. Chatman*, 578 U.S. 488, 499 (2016); *United States v. Hernandez-Garcia*, 44 F.4th 1157, 1166 (9th Cir. 2022). First, "the defendant must make a prima facie showing that the challenge was based on an impermissible ground, such as race." *Collins*, 551 F.3d at 919. Second, if a prima facie case is established, "the burden then shifts to the prosecution to offer a race-neutral reason for the challenge." *Id.* (quoting *Green v. Lamarque*, 532

F.3d 1028, 1030 (9th Cir. 2008)). "At this [second] step of
the inquiry, the issue is the facial validity of the prosecutor's
explanation." *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per
curiam) (alteration in original) (quoting *Hernandez v. New
York*, 500 U.S. 352, 360 (1991) (plurality opinion)). This
"does not demand an explanation that is persuasive, or even
plausible." *Id*. Finally, "if the prosecutor offers a race-
neutral explanation, the trial court must decide whether the
defendant has proved the prosecutor's motive for the strike
was purposeful racial discrimination." *Collins*, 551 F.3d at
919 (quoting *Green*, 532 F.3d at 1030). "It is not until the
*third* step that the persuasiveness of the justification
becomes relevant—the step in which the trial court
determines whether the opponent of the strike has carried his
burden of proving purposeful discrimination." *Purkett*, 514
U.S. at 768.

In this case, and in light of the initial uncertainty over
K.A.'s race, the district court ruled for the government under
*Batson*'s second and third prongs. Under any standard of
review, we agree with the district court that at *Batson* step
two, K.A's views that policing in the United States is "rooted
in anti-black racism" and is "structurally" racist provided a
neutral justification for the government striking her. The
import of K.A.'s answers, both in her questionnaire and in
response to follow-up questioning, was that K.A. would be
"critical of the opinions and perceptions" of law enforcement
officers based on her belief that policing was affected by
racial bias. Although K.A.'s views had a racial orientation
and were focused through a racial lens, striking her for these
views, without more, did not amount to a strike based on
K.A.'s own race. K.A.'s views, which are held by persons
across different races, reflected an attitude toward the
criminal justice system that the government could

reasonably regard as impeding her ability to assess the facts impartially. The racial overtones of K.A.'s answers did not mean the government's peremptory strike was itself race-based. The case law firmly bears out our conclusion.

Our decisions in *Tolbert v. Gomez*, 190 F.3d 985 (9th Cir. 1999), and *United States v. Steele*, 298 F.3d 906 (9th Cir. 2002), reject the proposition that striking a prospective juror based on her views about racial prejudice in the judicial system amounts to a *Batson* violation. The first case, *Tolbert*, was a habeas action challenging the prosecutor's use of a peremptory strike against a prospective Black juror, Edward Robertson. 190 F.3d at 986–87. During voir dire, Robertson asked to speak with the judge, and, after approaching the bench, stated:

> Oh boy. It is something that I feel strongly about. And in listening to all the questioning that you did of all the jurors and so forth you asked about, you know, how they felt about police and so forth like that, but as I sat there I was curious as to why we did not ask anything about their race. And to me this is a highly charged issue nowadays and it just concerns me whether or not an individual can look at an individual and not have predetermined views as to whether or not a defendant is guilty based on their race or how they personally feel . . . .

*Id.* at 987. Although Robertson stated that he could set aside this "personal opinion," he also told the judge "I am dealing with it every day" and "I think you need to bring that out." *Id.* The next day, the prosecutor exercised a peremptory

challenge against Robertson, and the defense brought the California state-law equivalent of a *Batson* challenge. *Id*. The state trial court denied the challenge, finding the defendant had failed to establish a prima facie case of discrimination. *Id.*

We affirmed the denial of habeas relief. *Id.* at 988–89. We held that "[c]hallenging a prospective juror on the basis of his expressed opinions about the judicial system does not violate *Batson*." *Id.* Applying this principle, we rejected the contention "that striking Robertson on the basis of his opinions on race was equivalent to striking him on the basis of his race," because the defendant failed to show "that Robertson's concern regarding the potential of racist attitudes of juries is 'a characteristic that is peculiar to any race.'" *Id.* (quoting *Purkett*, 514 U.S. at 769); *see also id.* ("Robertson's views about racial attitudes are shared by many not of his race or belonging to any racial minority. Thus, having failed to establish that Robertson's opinions about the importance of race was peculiar to his race, or that the opinions stood as a proxy for it, defense counsel did not raise even an inference that the prosecutor's challenge was based on Robertson's race, thereby violating the Equal Protection Clause."). Indeed, we held, "[t]he assumption that race and an opinion on race are inseparable is antithetical to the very type of racial stereotyping that *Batson* forbids." *Id.* Although *Tolbert* was a habeas case in which our review was deferential, *id.* at 988, our application of *Batson* did not depend on the deferential standard. Regardless, *Tolbert*'s reasoning is substantially the same reasoning we give here for rejecting defendants' challenge to the government's striking of K.A.

Another supportive decision is *United States v. Steele*. In *Steele*, a direct appeal of a criminal conviction, a

prospective Black juror, Jackson, stated during voir dire that "I have strong opinions about police and the system and how it works." *Id.* at 913. When questioned, Jackson elaborated "that she believed that sometimes people were treated unfairly by the police because of their race." *Id.* At the prosecution's request, the court then "conduct[ed] voir dire on the issue whether the jurors, in general, perceived that minorities are treated unfairly by the police." *Id.* During this process, another prospective juror, Baham, stated that she "believed that minorities are discriminated against by the criminal justice system" but "could put aside these views during trial." *Id.* The prosecution later used a peremptory challenge to remove Baham. *Id.*

On appeal, we held that the government had offered a legitimate race-neutral explanation—"that it struck Baham because of her view that racial discrimination may taint the criminal justice system." *Id.* at 914. Citing *Tolbert*, we explained that this justification was race-neutral because it was "not based on the race of the prospective juror" and "not linked to any racial group." *Id.*; *see also Cummings v. Martel*, 796 F.3d 1135, 1147 (9th Cir. 2015) (rejecting *Batson* challenge on habeas review under *Tolbert* where prospective juror stated he had been "victimized by racial prejudice" which "has had an impact on me in terms of the criminal justice system," because "[a]lthough these reasons touch on race, the record does not show that the strike was 'based on' race or stereotyping" (quoting *Hernandez*, 500 U.S. at 375 (O'Connor, J., concurring))).

Decisions in other circuits are in line with *Tolbert* and *Steele*. In *United States v. Fike*, 82 F.3d 1315 (5th Cir. 1996), *overruled on other grounds by United States v. Brown*, 161 F.3d 256 (5th Cir. 1998), which we cited in *Tolbert*, the Fifth Circuit explained that "*Batson* does not

forbid striking a juror who holds a particular opinion about the U.S. justice system. Rather, it forbids striking jurors based on their race." *Id.* at 1320. In *Fike*, the prosecutor struck Williams, a Black prospective juror, who indicated that he would "'have a concern' if an all white jury was selected . . . 'based on the practice of the U.S. Justice System.'" *Id.* at 1319. Despite the juror's views on issues of racial justice, the Fifth Circuit rejected the *Batson* challenge. *Id.* at 1319–20.

Other circuits have ruled similarly. In *United States v. Jacobs*, 21 F.4th 106 (3d Cir. 2021), for example, the Third Circuit rejected a *Batson* challenge after a prosecutor struck a prospective juror due to his "issues with the criminal justice system because of statistics and studies that he read," which were "based . . . in part on his own experiences as a Latino person." *Id.* at 115. Relying on our decision in *Tolbert*, the Third Circuit held that "[c]hallenging a prospective juror on the basis of his expressed opinions about the judicial system does not violate *Batson*." *Id.* (alteration in original) (quoting *Tolbert*, 82 F.3d at 1320); *see also United States v. Gooch*, 665 F.3d 1318, 1330 (D.C. Cir. 2012) ("The Government's strike cannot be seen to have been discriminatory, merely because the Juror referenced race in expressing concerns about blacks' being pulled over by the police. We have no good reason to disagree with the District Court's finding that the Government may have been reasonably concerned about the Juror's apparent distrust of the police."); *Akins v. Easterling*, 648 F.3d 380, 388–89 (6th Cir. 2011) (noting that the Fifth and Ninth Circuits had rejected "arguments that striking a juror because of the juror's expressed views on race in the criminal justice system is the same as striking the juror because of the juror's

race," and "find[ing] their reasoning persuasive" for purposes of a habeas petition under 28 U.S.C. § 2254).

Defendants nonetheless argue that K.A.'s views on policing in the United States were a proxy for race. But the record does not support that inference, and we rejected substantially the same argument in *Tolbert*. *See* 190 F.3d at 989 ("Robertson's views about racial attitudes are shared by many not of his race or belonging to any racial minority."). We have no basis to reach a different conclusion here. This case is thus a far cry from *United States v. Bishop*, 959 F.2d 820 (9th Cir. 1992), *overruled on other grounds by United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010), on which defendants principally rely. There, we held that striking a juror because she lived in Compton—which was roughly 75% Black—was an impermissible proxy for race, where the prosecutor's stated reasons for the strike "amounted to little more than the assumption that one who lives in an area heavily populated by poor black people could not fairly try a black defendant." *Id.* at 822, 825. When the prosecutor's "invocation of residence both reflected and conveyed deeply ingrained and pernicious stereotypes," we could not regard it as race-neutral. *Id.* at 825. Suffice it to say, the record in this case reflects no such pernicious stereotyping.

Finally, turning to *Batson*'s third step, we find no error in the district court's determination that the government's reason for striking K.A. was not pretextual. Contrary to defendants' insistence that the district court failed to evaluate sufficiently the government's justification for striking K.A., *see United States v. Alanis*, 335 F.3d 965, 969 (9th Cir. 2003) (a court must "evaluate meaningfully the persuasiveness of the prosecutor's" explanations), the district court engaged in a thorough discussion of the *Batson* challenge with counsel, including by asking how it should

determine pretext, re-reviewing K.A.'s questionnaire response, and comparing the prosecution's strike of K.A. with its for-cause motion to strike the other Black juror (a motion that the district court had denied). The district court amply satisfied the requirement that the court "make a deliberate decision whether purposeful discrimination occurred." *Id.* Our conclusion is further buttressed by record evidence indicating that the government was not sure of K.A.'s race, and that it had moved to strike another potential juror who had expressed negative views of law enforcement. There was thus no *Batson* violation.

\*         \*         \*

For the reasons set forth in this opinion and our accompanying memorandum disposition, we affirm defendants' convictions.

**AFFIRMED.**

---

BERZON, Circuit Judge, dissenting in part and dissenting from the judgment:

I disagree that bifurcation in this case is barred under *United States v. Barker*, 1 F.3d 957 (9th Cir. 1993),[1] and therefore dissent.

According to the majority, *Barker* stands for the general proposition that trial on different elements of a single crime can *never* be bifurcated, no matter the offense at issue or the prejudice from trying all elements together. That reading dramatically overstates *Barker*'s actual holding. *Barker*'s

---

[1] All *Barker* citations are to the version as amended on denial of rehearing. *See* 20 F.3d 365 (9th Cir. 1994).

reasoning, and so its bifurcation holding, focused squarely on the crime there at issue: possession of a firearm by a convicted felon, 18 U.S.C. § 922(g)(1). The element sought to be tried first in *Barker*, possession of a firearm, is ordinarily a benign act, not a crime. That characteristic of § 922(g)(1) was central to the analysis and outcome in *Barker*.

The federal Violent Crimes in Aid of Racketeering Activity (VICAR) statute, 18 U.S.C. § 1959, is fundamentally different from § 922(g)(1) with regard to the critical aspect of *Barker*. The VICAR element sought to be tried first in this case is having committed (but not necessarily having been convicted of) a separate, standalone violent crime—here, murder. Expanding *Barker*'s § 922(g)(1) holding to VICAR despite the sharp divergence between the two statutes has no basis in precedent or logic. *Barker*'s reasoning does not support this extension. And there were compelling reasons here to separate the trial on VICAR's violent crime element from the trial on its additional requirements, as the district court recognized. So while I agree that the district court correctly rejected the jury composition challenge under *Batson v. Kentucky*, 476 U.S. 79 (1986), I would reverse and remand for a new trial.

## I.

### A.

*Barker* is foundational to the majority's misguided bifurcation analysis. I first review the facts and statute there at issue before turning to the case before us.

The defendant in *Barker* was charged with being in a felon in possession under 18 U.S.C. § 922(g)(1). That statute makes it "unlawful for any person ... who has been

convicted . . . of[] a crime punishable by imprisonment for a term exceeding one year . . . to . . . possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce." 18 U.S.C. § 922(g)(1). The crime has three elements: (1) possession of a firearm, (2) transportation or receipt of the firearm in interstate commerce, and (3) a prior felony conviction.

Barker had previously been convicted of felony burglary, a fact he did not dispute. But he was concerned that informing the jury of the details of his burglary conviction— or even referencing the fact that he had been convicted of any felony at all—would unfairly prejudice the jury's consideration of the possession and interstate commerce elements. 1 F.3d at 958. So he proposed to bifurcate the trial. 1 F.3d at 958.

The district court granted Barker's motion to bifurcate and planned to put in place the following procedure: In the first phase, the jury would consider only the possession and interstate commerce elements. The district court would instruct the jury that "the parties have agreed that mere possession [of the firearm] is criminal in this case," and that it was "not for [the jury] to decide the wisdom of such a law." 1 F.3d at 958 (alterations in original). The district court would "charge the jury that it must find the defendant guilty . . . if it finds that he possessed the weapon and the weapon moved in interstate commerce." In phase one, the jury would not be presented with any evidence of Barker's conviction, nor would it be informed that a felony conviction was an element of the crime charged.

If the jury found Barker guilty on the possession and interstate commerce elements, a second phase could address

whether Barker had been convicted of a felony. The plan, however, was that if the jury found Barker guilty as to possession and commerce in phase one, Barker would then stipulate to his prior conviction. 1 F.3d at 958. Under this plan, there was no way the prior conviction as a factual element would ever reach the jury. If the jury acquitted in phase one, the trial would end; if not, the stipulation to the prior conviction would necessarily result in a guilty verdict. Either way, the outcome would be fixed after phase one.

Before trial, the government appealed the district court's bifurcation decision and sought mandamus relief. *Id.* This court issued a writ of mandamus reversing the district court's bifurcation decision, holding that "the district court may not bifurcate the single offense of being a felon in possession of a firearm into multiple proceedings." *Barker*, 1 F.3d at 959. The majority opinion in this case explains *Barker* as providing three rationales for its holding:

First, "*Barker* justified its rejection of the district court's bifurcation order on the ground that it 'might unfairly confuse the jury, prompting it to exercise its power of nullification on the unwarranted belief that the defendant was charged for noncriminal conduct.'" Maj. Op. at 14 (quoting *Barker*, 1 F.3d at 959). In support of this point, *Barker* quoted the First Circuit's explanation in *United States v. Collamore*, 868 F.2d 24, 28 (1989), which similarly held that trial on the elements of a § 922(g)(1) charge may not be bifurcated. Here is the portion *Barker* quoted:

> [W]hen a jury is neither read the statute setting forth the crime nor told of all the elements of the crime, it may, justifiably, question whether what the accused did was a crime . . . Possession of a firearm by most

> people is *not* a crime. A juror who owns or
> who has friends and relatives who own
> firearms may wonder why [the defendant's]
> possession was illegal. Doubt as to the
> criminality of [the defendant's] conduct may
> influence the jury when it considers the
> possession element.

*Barker*, 1 F.3d at 959 (alterations in original) (quoting
*Collamore*, 868 F.2d at 28).

Second, *Barker* stated that "[l]imiting the jury's
consideration of required elements of an indicted offense is
contrary to the presumption against special verdicts in
criminal cases." 1 F.3d at 959. Unlike a general verdict,
which simply requires the jury to say whether the defendant
is guilty or not, a special verdict asks the jury to make
findings on specific issues of fact. *See* Fed. R. Civ. P. 49. In
support of its special verdict point, *Barker* cited *United
States v. Aguilar*, 883 F.2d 662, 690 (9th Cir. 1989), but did
not otherwise elaborate.

Third, *Barker* maintained that the district court's
bifurcation plan risked redefining the § 922(g)(1) charge
there at issue. Bifurcation would "change[] the very nature
of the charged crime" and "remove[] an element of the crime
from the jury's consideration." 1 F.3d at 959; *see* Maj. Op.
at 13. If the jury found Barker not guilty in the first phase,
"[t]he government would be precluded from proving an
essential element of the charged offense, and the district
court would breach its duty to instruct the jury on all the
essential elements of the crime charged"—"an
impermissible result." 1 F.3d at 959; *see* Maj. Op. at 13.
*Barker* also likened the district court's bifurcation plan to a
rule that would "eliminate[] an element of a crime legislated

by Congress." 1 F.3d at 959 (quoting *United States v. Gilliam*, 994 F.2d 97, 102 (2d Cir. 1993)).

## B.

This case has nothing to do with the felon-in-possession charge at issue in *Barker*. It involves murder in aid of racketeering under the federal VICAR statute, 19 U.S.C. § 1959. VICAR makes it a federal crime to commit any state or federal crime of violence against a person, including murder, "for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity." 18 U.S.C. § 1959(a).[2] An "enterprise" includes "any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce." 18 U.S.C. § 1959(b)(2).[3] "Racketeering activity" is defined to include a sweeping set of criminal

---

[2] Subsection (a) provides in full:

> Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders, kidnaps, maims, assaults with a dangerous weapon, commits assault resulting in serious bodily injury upon, or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do, shall be punished [according to the crime committed as specified by the statute].

[3] A "partnership, corporation, association, or other legal entity . . . which is engaged in, or the activities of which affect, interstate or foreign commerce" also qualifies as an "enterprise." 18 U.S.C. § 1959(b)(2).

conduct, including murder, kidnapping, robbery, gambling, bribery, embezzlement, fraud, or dealing in a controlled substance. *See* 18 U.S.C. § 1961(1).[4]

A VICAR charge has four elements: First, the defendant must have "committed one of the enumerated offenses, in violation of state or federal law." *United States v. Elmore*, 118 F.4th 1193, 1199 (9th Cir. 2024). This initial element "incorporates the elements of the relevant predicate violation." *Id.* The remaining three elements involve the racketeering enterprise. They are: (1) "that the criminal organization exists"; (2) "that the organization is a racketeering enterprise"; and (3) "that the defendant acted for the purpose of promoting his position in a racketeering enterprise" in committing the predicate crime. *United States v. Banks*, 514 F.3d 959, 964 (9th Cir. 2008) (alterations omitted) (quoting *United States v. Bracy*, 67 F.3d 1421, 1429 (9th Cir. 1995)).

VICAR is atypical in that it incorporates, as one element, having committed (but not necessarily having been convicted of) an entirely separate state or federal crime.[5] In

---

[4] The VICAR statute incorporates the definition of "racketeering activity" from the Racketeer Influenced and Corrupt Organizations (RICO) Act. *See* 18 U.S.C. § 1959(b)(1).

[5] The criminal provision of the RICO statute is somewhat similar, although it requires committing "at least two acts of racketeering activity." *See* 18 U.S.C. §§ 1961(5) & 1963. Crucially—the majority misses this important distinction, *see* Maj. Op. at 29—§ 922(g)(1) is *not* similar. VICAR incorporates the *legal* elements of a state law crime, and a jury must then, to find VICAR's predicate crime element satisfied, make factual findings that those incorporated elements are met. Section 922(g)(1) does not operate this way. Instead, the prior-conviction element of § 922(g)(1) simply asks whether the defendant had been *convicted* of a crime by another court.

a sense, the statute thus operates like a sentencing enhancement, applicable if the underlying state or federal violent crime is carried out for a racketeering enterprise purpose within the meaning of the statute. It can also confer federal jurisdiction, if the predicate crime is a state crime. (This case illustrates the practical consequence of the conferral of federal jurisdiction, as the state prosecutor declined to bring murder charges.

Here, the indictment charged that defendants Robert Manning and Jamare Coats, "for the purpose of gaining entrance to and maintaining and increasing position in Mac Block, an enterprise engaged in racketeering activity, unlawfully and knowingly murdered Victim One, . . . in violation of California Penal Code Sections 187, 188, 189, and 31." The alleged enterprise was "Mac Block," a "criminal street gang." The government's evidence that this enterprise existed and that Manning and Coats were affiliated with it included testimony about six prior incidents:

- In 2013, police tried to pull over a vehicle Manning was driving, but Manning drove away and was lost in a high-speed chase. After the car was abandoned, police found Manning and Coats walking near it.

- In 2013, police encountered Coats on the street and, suspecting that he had a gun, ordered him to stop. Coats fled and was seen discarding a gun under a parked car. Police recovered the gun but lost Coats in a crowd and did not apprehend him.

- In 2013, three people, at least one of whom was assertedly affiliated with Mac Block, robbed a marijuana dispensary at gunpoint. Neither Manning nor Coats was involved in this incident.

- In 2015, after a report of shots being fired on a street, Coats admitted to having fired a gun; nobody was hit or injured in the shooting.

- In 2016, someone fired multiple shots at a victim who was injured. Several Mac Block members, but not Manning or Coats, were assertedly involved in the incident.

- In 2018, Manning's brother, allegedly a Mac Block member, fired shots into the air from a parking lot.

Only three of the six incidents involved Manning or Coats, and all of them took place several years before the 2019 murder for which defendants were charged.

Defendants proposed to bifurcate trial, with the predicate California murder element to be considered in the first phase and the racketeering enterprise elements in the second. Notably, unlike the bifurcation plan in *Barker*, both phases of trial under defendants' proposal in this case would involve complex, disputed factual questions. Defendants argued that there was a "great risk . . . that the jury will convict even if the jurors have reasonable doubt whether a murder occurred because of the prejudicial spillover effect of the enterprise evidence," including evidence about the six prior acts involving defendants and others. The defendants noted that

"there may be some evidence introduced of enterprise membership" in the predicate-charge phase, but argued that "the vast majority of the enterprise evidence" would be relevant only to the second, enterprise phase.

The district court denied the motion to bifurcate. It recognized that there was "some possibility" that the enterprise evidence could be prejudicial as to the murder element and explained that "on a clean slate," bifurcation would be warranted. But it concluded that bifurcation of the VICAR murder charges was foreclosed by *Barker*, a decision it stated was "wrong as a matter of justice." The district court told the defendants they had "a decent point for appeal" and expressed "hope" that this court would "adjust" *Barker*.

## II.

With this background on *Barker* and VICAR in mind, I turn to the majority's misguided extension of *Barker*'s context-specific holding that a "district court may not bifurcate the single offense of being a felon in possession of a firearm" to the VICAR statute. 1 F.3d at 959. In the majority's view, "*Barker*'s core rationale transcends § 922(g) or any particular criminal offense," and a "faithful reading of *Barker* forecloses defendants' argument" that *Barker* should be limited to § 922(g)(1) felon-in-possession cases. Maj. Op. at 14. I strongly disagree.

By its own terms, *Barker* applies only to § 922(g)(1). *Barker*'s guiding rationales, which the majority relies on almost exclusively to reach its conclusion, were specific to the felon-in-possession charge and the proposed bifurcation plan there at issue. Most fundamentally—variations on this theme will reappear throughout this dissent—VICAR is foundationally different from § 922(g)(1) because of its

unusual crime-within-a-crime structure. For that reason (and variants of it), none of the rationales identified by the majority support the conclusion that bifurcation should be prohibited in VICAR trials, either as an application or extension of *Barker*, or as a matter of first principles.

## A.

The strongest justification for *Barker*'s holding was its concern over unwarranted jury nullification. As the majority acknowledges, this concern is entirely absent in this VICAR case.

In *Barker*, the proposed first phase would address only conduct that is most often benign and legal: possessing a firearm that had been transported or received in interstate commerce. *Barker* recognized that a jury informed in the first phase about only these elements might nullify the charge before reaching phase two—even if possession been proven beyond a reasonable doubt—because of reluctance to declare a defendant who engaged in only the first-phase conduct a criminal, subject to imprisonment and fines. This concern has resonance in the § 922(g)(1) context—enough alone to justify *Barker*'s holding that trial of a § 922(g)(1) charge cannot be bifurcated.[6]

But *Barker*'s jury nullification concern "does not apply in this case," as the majority concedes. Maj. Op. at 16. The first element of the VICAR statute is a separate state or federal violent crime. *See* 18 U.S.C. § 1959(a). Unlike in *Barker*, the criminal conduct to be considered in the first phase is illegal in itself, as well as violent and so dangerous

---

[6] Although the issue is not before us, I assume here that *Barker* was correctly decided, as it may well have been in the context of § 922(g)(1). *Barker* is in any event binding precedent.

by definition. There is not the slightest risk that a jury would "doubt . . . the criminality" of murder, as it well might the simple possession of a firearm. *Cf.* 1 F.3d at 959 (quoting *Collamore*, 868 F.2d at 28).

The majority accepts that risk of jury nullification at play in *Barker* is entirely absent in this case, but it fails to grapple with how fundamental that risk was to *Barker*'s reasoning and outcome. In reality, the nullification concern was the cornerstone of *Barker*'s conclusion; without it, the logic of the holding crumbles.

The felon element of § 922(g)(1) is "wholly independent[]" from the factual question of whether the defendant later possessed a firearm. *Old Chief v. United States*, 519 U.S. 172, 190 (1997). If it could somehow be guaranteed that a jury would fairly and accurately evaluate the possession and commerce elements in the first phase of a bifurcated § 922(g)(1) proceeding with no risk of unwarranted nullification, the remainder of *Barker*'s reasoning would ring hollow. Here is why: If the jury were to acquit in phase one—not because it decided to nullify but because it concluded that the defendant had not in fact possessed a firearm—the defendant *would* be innocent, regardless of whether he or she was a felon. Without a risk of jury nullification, any limitation that bifurcation might impose on the prosecutor's prerogative to decide how to present the case, the legislature's definition of the crime, or the defendant's jury trial rights would be essentially harmless, and would not support *Barker*'s holding. And, as a countervailing consideration, bifurcation would eliminate a separate risk—the risk that the jury would convict the defendant because he was a felon, even if he did not in fact possess the firearm as charged.

Not surprisingly, *Barker* relied on the risk of jury nullification, incorporating the First Circuit's jury nullification reasoning from *Collamore*, 868 F.2d at 28. Jury nullification was a primary reason offered by both *Collamore* and the other bifurcation cases *Barker* cited in support of its holding. *See Collamore*, 868 F.2d at 28; *United States v. Brinklow*, 560 F.2d 1003, 1006 (10th Cir. 1977). The risk of nullification was also identified as a central rationale in nearly every post-*Barker* opinion cited by the majority that held that a § 922(g)(1) trial cannot be bifurcated. *See* Maj. Op. at 18–19 (collecting cases).[7]

No jury is going to acquit a guilty defendant of murder because it regards that charge as encompassing only benign conduct. As there is no risk of unwarranted jury nullification here, *Barker*'s most convincing and foundational rationale

---

[7] *United States v. Jacobs*, 44 F.3d 1219, 1222 (3d Cir. 1995), quoted in full the same jury nullification discussion from *Collamore* that *Barker* did. So did *United States v. Milton*, 52 F.3d 78, 81 (4th Cir. 1995); *United States v. Dean*, 76 F.3d 329, 332 (10th Cir. 1996); and *United States v. Mangum*, 100 F.3d 164, 171 & n.11 (D.C. Cir. 1996). *Milton* also characterized *Barker* as "predicated on the notion that removing the prior felony element from the jury's consideration would be confusing to a jury inasmuch as simple possession of a firearm, without more, is not a crime." 52 F.3d at 81. In *United States v. Clark*, 184 F.3d 858, 867 (D.C. Cir. 1999), the D.C. Circuit cited *Mangum*'s discussion of the risk of jury nullification and rejected defendant's bifurcation argument "[f]or the same reason." *United States v. Koskela*, 86 F.3d 122, 125 (8th Cir. 1996), provided no reasoning, but cited *Collamore*, *Birdsong*, *Barker*, *Milton*, and *Jacobs*. Finally, *United States v. Amante*, 418 F.3d 220, 224 (2d Cir. 2005) held that "bifurcation of the elements of a single-count felon-in-possession trial, absent the government's consent, is generally error" but declined to "rule out bifurcation where the facts underlying the prior felony would be presented to the jury and are so heinous as to overwhelm the trial of firearm or ammunition possession."

provides no support for the majority's misguided conclusion.

## B.

The second *Barker* rationale relied on by the majority is that "[l]imiting the jury's consideration of required elements of an indicted offense is contrary to the presumption against special verdicts in criminal cases." Maj. Op. at 13 (quoting *Barker*, 1 F.3d at 959). Bifurcating trial on the elements of a single criminal charge, the majority continues, could "be too intrusive of the jury's internal processes" and might "lead to a framing of the case that unduly restricts the jury's role." Maj. Op. at 14. This reasoning is both quite vague and, insofar as it can be pinned down, entirely unconvincing.

Most fundamentally, the reasons why courts typically disfavor special verdicts in criminal cases undercut rather than support the majority's conclusion. Special verdicts are avoided in order to protect *defendants*. The worry behind the disfavor of special verdicts is that requiring the jury to answer additional questions beyond the guilty-or-not binary might unfairly nudge the jury toward a guilty verdict. As the First Circuit has explained, a step-by-step questionnaire can "catechize" a juror into reaching a conviction: "By a progression of questions each of which seems to require an answer unfavorable to the defendant, a reluctant juror may be led to vote for a conviction which, in the large, he would have resisted." *United States v. Spock*, 416 F.2d 165, 182 (1969).[8]

---

[8] Some have questioned whether favoring general verdicts actually benefits defendants. For complicated charges, breaking down the elements of a charge might minimize confusion. *See generally* Avani

True, bifurcation here would be functionally similar to a two-question special interrogatory.[9] But neither the majority nor *Barker* explains how this simple structure would sway the jury toward a guilty verdict or otherwise infringe a defendant's jury trial rights. In most cases involving VICAR charges, the potential prejudice from allowing the jury to consider enterprise evidence in deciding whether the predicate crime was committed would likely outweigh the risk—if any—that a two-step verdict would tilt the jury toward a conviction. So the rationale behind courts' usual aversion to special verdicts does not support solidifying an absolute rule against bifurcation, at least in VICAR cases. And in any event, where bifurcation is sought by a defendant, there is no reason why the defendant could not waive any impairment of their jury rights that might ensue.

Moreover, to the extent avoiding special verdicts serves to protect the integrity of "the jury's internal processes" and ensure that the "jury's role" is not "unduly restrict[ed]," *see* Maj. Op. at 14, the reason is again to protect *defendants*, by preserving the "doctrine of 'jury nullification'" and ensuring that the jury retains full ability to exercise its "power of

---

Mehta Sood, *Reaching A Verdict: Empirical Evidence of the Crumbling Conventional Wisdom on Criminal Verdict Format*, 98 N.Y.U. L. Rev. 1265 (Oct. 2023). In this case, the question is not whether avoiding special verdicts is warranted as a general rule, but whether the rationale behind the avoidance supports the majority's rigid anti-bifurcation rule, in this case or more broadly.

[9] Under the proposal here, the jury (not the judge) would make the ultimate determination of guilt. A true "special verdict," however, is one in which "the jury makes findings only on factual issues submitted to them by the judge, who then decides the legal effect of the verdict." *See Verdict*, Black's Law Dictionary (12th ed. 2024). The ultimate verdict under the plan proposed here would be more closely analogous to a general verdict with interrogatories. *See* Fed. R. Civ. P. 49.

lenity." *United States v. Desmond*, 670 F.2d 414, 416–17 (3d Cir. 1982); *see also United States v. Gonzales*, 841 F.3d 339, 347 (5th Cir. 2016) ("Much of [courts'] hostility [to special interrogatories] stems from a desire not to undermine jury nullification.").[10] Here, too, the majority does not explain how the simple bifurcation plan proposed in this case would inhibit the jury's ability to exercise this power, especially since the jury's ultimate verdict as to the VICAR charge in the second phase would still be issued in the form of a general verdict.

Finally, and at a more basic level, the majority fails to justify its rigid rule against bifurcation given that special verdicts, while disfavored, are both permissible and used increasingly frequently in criminal cases. There is "no per se prohibition" against special verdicts. *United States v. Reed*, 147 F.3d 1178, 1180 (9th Cir. 1998). "Exceptions to the general rule disfavoring special verdicts in criminal cases have been expanded and approved in an increasing number of circumstances," including the use of special interrogatories "to issue findings as to each element of an offense." *Id.* at 1180–81. The majority attempts to support its conclusion by quoting *Aguilar*'s statement that "it is not the practice of the Federal Courts in criminal cases to call for special verdicts." Maj. Op. at 13 (cleaned up) (quoting 883

---

[10] I note that there is obvious tension between *Barker*'s jury nullification rationale and its no-special-verdicts rationale, at least in the § 922(g) context where bifurcation presents a risk of unwarranted jury nullification. The first is a concern that bifurcation will lead the jury to be suspicious of an element of the crime considered separately, which it would not be were the crime considered holistically, and so to acquit when it would otherwise convict. The second is a concern that separate consideration of each element will lead a jury to convict on each discrete element, when it would acquit were the crime considered holistically.

F.2d at 690). But *Aguilar* also made clear that, "[w]hile a special verdict is the exception and not the rule, there may be cases in which it is appropriate." 883 F.2d at 690–91.

"Whether or not it is appropriate to use 'a special verdict should be determined according to the particular circumstances of each case.'" *United States v. Ramirez*, 537 F.3d 1075, 1083 (9th Cir. 2008) (alteration omitted) (quoting *Reed*, 147 F.3d at 1180). Given the particular circumstances of *this* case, a bifurcation proceeding, somewhat analogous to a two-part special interrogatory, is appropriate to avoid unfair prejudice to the defendants, as the district court explained. Indeed, district courts have used special interrogatories in VICAR murder cases without issue.[11] The majority's approach ignores the permissibility and utility of special verdicts in particularly complex criminal cases and the flexibility afforded to district courts, instead requiring courts to ignore the circumstances of each case and rigidly reject bifurcation regardless of the tradeoffs.

There is no absolute principle precluding special verdicts or interrogatories in criminal cases, and the tendency to disfavor their use arises from a desire to protect defendants. These considerations suggest that bifurcating trial on the elements of a VICAR charge *can* be appropriate, in this case and as a general rule, if the district judge so determines.

In short, neither of the first two *Barker* rationales relied on by the majority—the jury nullification point and the

---

[11] *See, e.g.*, Special Verdict Interrogatory Form, ECF No. 1413, *United States v. Cyrus*, No. 05-cr-324 (N.D. Cal. May 13, 2009) (VICAR murder charge), *aff'd* 526 Fed. Appx. 794 (9th Cir. 2013); *United States v. Howard*, No. 22-3079, 2024 WL 2795744, at *2 (2d Cir. May 31, 2024) ("The jury specifically found that the VICAR predicate offense was assault with a dangerous weapon. See Special Verdict Tr.").

special verdicts point—supports expanding *Barker*'s § 922(g)-specific holding to the VICAR charges here at issue. The majority's conclusion must be justified, if at all, on other grounds.

## C.

The remainder of the majority's reasoning involves a series of points related to what the majority calls "[a] central animating principle of *Barker*": that "bifurcating the trial on the elements of a single criminal charge would redefine the offense itself" by "'chang[ing] the very nature of the charged offense' and 'eliminat[ing] an element of a crime.'" Maj. Op. at 15 (quoting *Barker*, 1 F.3d at 959). I am not at all sure that this "animating principle" has content beyond the two rationales already discussed, which both involve maintaining the jury's role in determining whether the defendant committed the offense as defined by Congress. Nonetheless, in this section, I try to give content to the majority's overlapping arguments. To the extent I can understand these arguments, I conclude that none support the majority's conclusion. First, though, I highlight a critical distinction between the bifurcation plan in *Barker* and the one proposed in this case.

## 1.

*Barker*'s concern with removing an element of an offense was arguably applicable in that case, but does not apply here. As I've explained, *Barker*'s proposed bifurcation procedure *would* have entirely removed one element from the jury's consideration, thereby effectively redefining the offense. Barker intended to stipulate to the only fact relevant to the second phase of the bifurcated proceeding: his undisputed prior conviction. *See supra* pp. 42–43. But he planned to stipulate to this fact only if the jury found him

guilty in phase one. As a result, the jury would never consider the key criminalizing element of the § 922(g)(1) charge there at issue: the felony conviction. If the jury found Barker not guilty in phase one, the trial would end via acquittal; if it found him guilty, the trial would end via stipulation. The reason this sequence was problematic in *Barker* was that the conduct to be addressed in phase one, the only conduct the jury would ever have an opportunity to consider, was entirely benign and lawful.[12] That concern is absent here.

To reach its holding, *Barker* relied on other § 922(g)(1) cases in which the entire prior conviction element of a § 922(g)(1) charge would similarly have been removed entirely from the jury's consideration. *See* 1 F.3d at 959 (citing *Brinklow*, 560 F.2d at 1006; *Gilliam*, 994 F.2d at 101–02).[13] *Barker*'s reliance on these cases makes clear that *Barker*'s reasoning depended on the fact that the bifurcation plan there *did* in effect "redefine the offense" by "eliminat[ing] an element of a crime." *See* Maj. Op. at 15 (quoting *Barker*, 1 F.3d at 959).

The bifurcation proposed in this case was entirely different than the procedures contemplated in *Barker* and the other § 922(g)(1) cases on which it relied. *Both* phases of the proceeding proposed here would involve hotly disputed

---

[12] Here is one example of why this "central animating principle" has little force independent of the other *Barker* rationales already discussed.

[13] *Brinklow* and *Gilliam* involved proposals to stipulate to the entire conviction *element* of § 922(g)(1), thereby removing the element entirely from the jury's consideration. *See Brinklow*, 560 F.2d at 1006; *Gilliam*, 994 F.2d at 101–02. The effect of these stipulations would be essentially the same as the bifurcation procedure proposed in *Barker*, which involved Barker stipulating to the fact of the conviction.

factual questions that would go to the jury. So the jury *would* consider all elements of the crime before a guilty verdict could be reached. Moreover, the conduct to be considered in the first phase—here, California murder—is by definition criminal on its own, so there is no risk that unwarranted nullification would short-circuit the proceeding and prevent the jury from reaching the enterprise elements.

There is of course one scenario under this plan in which some of the elements of a VICAR charge would never go to the jury: If the jury was presented with all of the admissible evidence with respect to the incorporated California murder element (including any enterprise evidence admissible with regard to the murder offense under ordinary evidence principles) and concluded that a defendant had *not* committed murder, then the jury would not consider the remaining enterprise elements. But this prospect does not mean that the bifurcation procedure somehow "redefined" the crime or "eliminated" the enterprise elements. Rather, if the defendant did not in fact commit the required predicate violent crime (as elsewhere defined by state or federal law), the defendant could not be guilty of a VICAR violation, so considering the remaining elements would be pointless. And that would be true if the case was not bifurcated: the jury in its deliberations would have no occasion to reach the enterprise elements if it concluded that the defendants were not guilty of murder under California law.

If the jury found a defendant *guilty* of a predicate violation in the first phase, however, the jury *would* consider all elements of the VICAR charge as defined by Congress. The enterprise elements would not be "eliminated," as the majority asserts; their consideration would simply be deferred. The key point is that before a conviction could be reached, the jury would consider all the evidence and all the

elements of the VICAR charge. By glossing over this reality, the majority misses a key distinction between this case and *Barker*.

**2.**

The majority also asserts that our "obligation to treat criminal offenses as Congress has defined them" suggests that we should not allow bifurcation. *See* Maj. Op. at 15. The majority states that bifurcation "hardly gives effect to Congress's articulation of the offense of VICAR murder." Maj. Op. at 18. But the majority's concern with legislative intent in defining crimes actually cuts against its ultimate conclusion, at least in the context of the VICAR statute.

Congress did not actually itself "articulat[e] the offense of VICAR murder," contrary to the majority's assertion. *See* Maj. Op. at 18. Instead, Congress opted to incorporate into the statute's predicate-crime requirement a slew of violent offenses, as defined by "the laws of any State or the United States." 18 U.S.C. § 1959(a). Where, as here, the predicate violation is a state crime, these elements (and the evidence relevant to prove them), are specified by the *state's* legislature and courts. Allowing a jury deciding whether a state crime was committed to consider evidence and elements in addition to those a state jury would consider expands the definition of the predicate crime as adopted by the relevant state legislature and incorporated by Congress. Congress could have chosen to articulate the prohibited conduct itself, but it instead elected to incorporate state law. So, contrary to the majority's conclusion, limiting the evidence that can be considered in evaluating the predicate crime to evidence that would be admissible for a corresponding standalone state charge is a more faithful way to implement Congress's incorporation of state law than

infecting the trial of the state charge with potentially prejudicial evidence not admissible as to the murder offense standing alone.

The majority's legislative intent reasoning also ignores the common use of bifurcation in the civil context. *See* Fed. R. Civ. P. 42(b). The majority does not explain how bifurcating trial on the elements of a criminal offense undermines Congressional intent any more than does bifurcating trial on a civil claim. Ultimately, whether trial on different issues or elements of a civil claim or criminal offense is bifurcated is a matter more of procedure than of substance. Procedural decisions regarding when evidence will be presented and how the jury will structure its verdict do not alter Congress's substantive definition of a criminal offense.

### 3.

Next, the majority asserts that *Barker*'s reasoning reflected "a broader concern" that bifurcation "'might unfairly confuse the jury.'" Maj. Op. at 17 (quoting *Barker*, 1 F.3d at 959). The majority asserts that "confusion would be an issue here, too, albeit for a different reason" than the risk of nullification, because bifurcation would "force jurors to view the facts of this case in an artificially constrained light" and "hamstring the government in its ability to explain the defendants' intent and motive." Maj. Op. at 18.

This reasoning is wrongheaded on several levels. To start, bifurcating a VICAR charge would not create "confusion" in the way that splitting a felon-in-possession charge does. Again, in *Barker*, the two-element version of § 922(g)(1) contrived for the case, which excluded the felony element, might have mystified the jury. The artificially constrained law as presented would clash with

common sense and with jurors' own experience. Even setting aside the potential for nullification, the law as presented might itself be perplexing, thus impeding the jury's ability to reach a verdict.

There is no corollary here. Under defendants' bifurcation proposal, the legal question to be considered in the first stage would be murder as defined by the California Penal Code. Unlike the contrived phase-one framework in *Barker*, nothing about the legal structure of murder under California law would be inherently confusing, any more than in any other murder trial.

The majority's real point is not that a jury might be confused about the *law*, as in *Barker*. Instead, the majority is concerned that, if the case were bifurcated, the jury would not have before it during the murder phase all the enterprise evidence that would be relevant during the second phase. And the majority is also concerned that it would be hard to determine which enterprise acts could be presented in the first phase versus the second. *See* Maj. Op. at 31. These concerns are baseless. In a bifurcated first phase where only the state-law murder element was at issue, the government, as in any murder trial, would be free to present any and all evidence (including enterprise evidence) relevant to the murder element and not unfairly prejudicial. *See* Fed. R. Evid. 401, 403, 404(b). As defendants recognize, some of the enterprise evidence relevant to phase two could meet these standards and thus could be presented in phase one.

But some of the enterprise evidence probably would not meet these standards, which is why defendants are seeking bifurcation. The enterprise evidence presented included, for example, criminal activity of individuals other than the defendants, as well as prior acts by the two defendants that,

defendants argued, would not meet the requirements of Federal Rule of Evidence 404(b).[14]

The majority is correct, in a sense, that the jury's consideration in phase one would be "constrained." Maj. Op. at 17. But the constraints would not be "artificial[]." *See* Maj. Op. at 17. Nor would the trial record be "artificially sanitized" or "incomplete." *See* Maj. Op. at 31. Instead, the constraints would be those supplied by the Federal Rules of Evidence and the Due Process Clause, and the trial record would include whatever evidence could satisfy generally governing, routinely applied evidentiary principles. This standard is hardly "unclear" or "muddled." Nor would these longstanding evidentiary principles "hamstring the government in its ability to explain the defendants' intent and motive," as the majority asserts. *See* Maj. Op. at 18, 30–31. They instead hold the government to an appropriately high standard for fairly proving a defendant's guilt beyond a reasonable doubt before securing a criminal conviction.

Limiting the evidence presented in the murder phase, as required by longstanding principles and rules, would clarify the issues to the jury, not confuse them. Indeed, "[c]ourts that follow the common-law tradition almost unanimously have come to disallow resort by the prosecution to any kind of evidence of a defendant's evil character to establish a probability of his guilt"—including "defendant's prior trouble with the law, specific criminal acts, or ill name

---

[14] Rule 404(b) provides that "[e]vidence of any other crime, wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Fed. R. Evid. 404(b)(1). But it also provides that "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).

among his neighbors." *Michelson v. United States*, 335 U.S. 469, 475 (1948). The reason is that "excluding such evidence"—even when it may have some "probative value"—"tends to *prevent confusion of issues*," in addition to avoiding "undue prejudice." *Id.* (emphasis added). Federal Rule of Evidence 404(b) is based on this longstanding and widespread practice. *See generally* Fed. R. Evid. 404(b) committee notes to 2006 amendment (citing *Michelson*, 355 U.S. at 476).

In short, bifurcation would indeed constrain the evidence that the jury could consider in the murder phase. But the only constraints would be those settled on through longstanding practice and embodied in the Federal Rules of Evidence and the Due Process Clause. These generally applicable constraints serve both to minimize prejudice and to prevent, not foster, confusion.

### 4.

Finally, the majority asserts that bifurcation could "prevent the government 'from proving an essential element of the charged offense.'" Maj. Op. at 13 (quoting *Barker*, 1 F.3d at 959).[15]

---

[15] The quoted passage from *Barker* cited *United States v. Campbell*, 774 F.2d 354, 356 (9th Cir. 1985), for the proposition that "the government is 'entitled to prove the[] elements of the charged offenses by introduction of probative evidence." But *Campbell*'s holding that the government has a right to present evidentiary proof for every element of an offense has been overruled. *See Old Chief*, 519 U.S. 172. *Old Chief* held that a district court abused its discretion by admitting evidence of the defendant's prior crime when the defendant had offered to concede the fact. 519 U.S. at 174. In reaching this conclusion, the Supreme Court necessarily held, contrary to *Campbell*, that the government is *not* always entitled to prove every element of an offense by introducing probative evidence.

Again, this case is different from *Barker* because the defendants did not propose to stipulate to any of the *elements* to be tried in either phase. So, as long as the jury found either defendant guilty of murder, the government would *not* be prevented from proving every element of the VICAR charge—indeed, it would be required to. The only way the government would not have an occasion to prove the enterprise elements is if the jury concluded, based on all evidence that would be admissible in a murder trial (including any enterprise evidence admissible under the Federal Rules of Evidence) that the defendant was *not* guilty of murder. The majority does not explain why the government has any interest in proving the VICAR enterprise elements if the defendant did not commit California murder and therefore cannot be guilty of VICAR murder.

\*       \*       \*

In sum, the bifurcation proposed here would not "redefine" the charged VICAR offense, nor would it eliminate any of its elements. Unlike in *Barker*, the jury here would be required to consider every element of the VICAR charge before convicting. Limiting the evidence presented in the initial state-law murder phase would prevent undue prejudice, minimize jury confusion of the issues, and honor Congress's decision to incorporate state-law definitions of crimes into the VICAR statute.

*Barker*'s no-bifurcation principle makes sense for § 922(g)(1) charges. But I would not extend the rule to VICAR offenses. The rationales that support *Barker*'s conclusion simply do not apply to the VICAR statute. As I've said, the VICAR statute is atypical in its incorporation of the elements of a state-law crime. This case does not

present the question whether there are other statutes sufficiently similar to VICAR that bifurcation could be available, although surely there are few, if any.

Nonetheless, the majority frets that this limited holding would "dramatically change federal criminal trials as we have known them" and would "fundamentally alter[] both the criminal adjudicatory process and the nature of criminal offenses." Maj. Op. at 30. The majority's "sky is falling" concerns are wildly overblown. And whatever (likely marginal) changes my proposed holding might lead to in very limited circumstances would be warranted to avoid unfair prejudice. *See supra* pp. 41–69. I would hold only that in the atypical context of the VICAR statute, bifurcation is permissible.

## III.

The district judge made clear that the government's enterprise evidence posed a risk of "unwarranted prejudice," and that absent *Barker* (as he interpreted it), he would have granted the motion to bifurcate. The government nonetheless argues, briefly and unconvincingly, that any error in not bifurcating was harmless.

To start, the government begins its harmlessness discussion by invoking two incorrect legal standards. First, the government wrongly suggests that defendants, rather than the government, bear the burden of showing that any error was not harmless. But it is "[t]he government [that] bears the burden of proving that the error was harmless beyond a reasonable doubt." *United States v. Esparza*, 791 F.3d 1067, 1074 (9th Cir. 2015). The government "cannot expect us to shoulder that burden for it." *United States v. Gonzalez-Flores*, 418 F.3d 1093, 1100 (9th Cir. 2005).

Compounding that mistake, the government also maintains that any error in not bifurcating was harmless unless the jury would have acquitted absent the error. But the harmless-error "inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error"; the question is instead "whether the error itself had substantial influence" on the jury. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). So the government's assertion that the murder evidence was "powerful" does nothing to illuminate the harmlessness issue. The question is not whether the jury could have convicted the defendants for murder without the enterprise evidence, but whether there was prejudice from otherwise inadmissible enterprise evidence that the jury considered alongside the murder evidence. *See id.* The government makes no attempt to show that jury's consideration of the enterprise evidence alongside the murder evidence in deciding the murder element did not have a "substantial influence" on the jury. *See id.*

Even putting aside these fundamental legal errors, the government's harmless-error arguments do not hold water. The government argues that the district court ultimately denied bifurcation as an exercise of discretion, because the district judge stated in its order denying defendants' motion for acquittal *after* the trial that the limiting instructions given were the "best solution" to limit prejudice. Alternatively, it also argues that the record suggests that the district court would have denied bifurcation if he had been given discretion to do so. These arguments misread the record. Both the trial record and the post-trial order make clear that the district judge did not think that he had discretion to bifurcate, because of *Barker*. So the denial was not an exercise of discretion, and the district court's statement that the limiting instructions were the "best solution" given "the

circumstances in this case" does not suggest that the district court would still have opted for limiting instructions if he thought bifurcation was permitted under *Barker*.

The government also contends that because trial here proceeded in the same sequence as it would have if it had been bifurcated, with the murder element addressed before the enterprise evidence, there could have been no prejudice. This argument misapprehends the nature of prejudicial evidence. "A drop of ink cannot be removed from a glass of milk." *Gov't of Virgin Islands v. Toto*, 529 F.2d 278, 283 (3d Cir. 1976). The question is not whether the jury was prejudiced at the moment it heard the murder *evidence*. The question is whether the jury was prejudiced by the time it had to decide whether to reach a murder *conviction*. Because the proceeding was not bifurcated, the jury had been presented with the potentially prejudicial enterprise evidence by the time it deliberated and reached its verdict. The government again fails to show that this evidence did not have a "substantial influence" on the jury. *See Kotteakos*, 328 U.S. at 765 (1946).

In short, the government here has entirely failed to establish that the failure to bifurcate this trial was harmless.

## Conclusion

In my view, the district court erred in concluding that it was barred under *Barker* from bifurcating the trial. The rationales that supported *Barker*'s conclusion simply do not apply to the VICAR statute. I would hold instead that a district court considering a VICAR charge predicated on a state crime can—but need not—bifurcate the trial on the predicate crime element from the trial on the remaining enterprise elements. I would hold that the district court was permitted to bifurcate the trial on the murder element from

the trial on the remaining enterprise elements. The district court's erroneous conclusion that it could not bifurcate the trial was not harmless. Accordingly, although I agree that the district court was not wrong to reject the *Batson* challenge, I would reverse and remand for a new trial.